Good morning. May it please the Court, my name is Natalie Landreth on behalf of the federally recognized tribe the Santa Ynez Band of Chumash Indians. The parties are splitting their time. I have ten minutes and I'd like to reserve three for rebuttal, so I'll only have a main of seven. All right, please watch the clock. Certainly, Your Honor. Congress amended the National Historic Preservation Act in 1992 specifically to help tribes protect their historic and cultural resources and property. To effectuate this, the statute and regulations state that federal agencies, quote, shall consult with any Indian tribes, end quote, that, quote, might attach significance to a property. That's the standard. And 36 C.F.R. 800.2 says, quote, is the statutory obligation of the federal agency to fulfill the requirements of law you've just stated. I have two factual questions. Certainly, Your Honor. One is, is it true that the tribe itself has its location outside the project area? I know it's affected by the river, but I want to know is its location outside the project area? The headquarters of the tribal government is indeed outside of the project area, but both the regulations and DOD policy direct federal agencies when they're trying to determine which tribes will be affected to look outside of the project area and to look to aboriginal, ceded, or ancestral lands in deciding who to contact. And that leads to my second question. What should the government have done that it did not do to locate this affected... I can't remember if it was a tribe or a band. I think it might have been a band of a tribe. Tell me whether it was a band or a tribe and tell me what more the government should have done that it did not do to locate them. This is the only federally recognized Chumash tribe on the list of federally recognized tribes issued by the BIA, which is issued every couple of years and is statutory and readily available on the Corps' own website. So it was on the BIA list but not that agency in California's list? Yes, it is. It's on the Corps' own website. It says Tribal Nations Directory and it's listed twice. The regulation requires the Corps to make a reasonable and good-faith effort and the Corps says we did that. We contacted SHPO several times. We contacted everyone that SHPO told us to contact. We contacted California NHC. We contacted every person they mentioned. So based on that, they say we made a reasonable and good-faith effort as required by regulation. So why is that wrong? I think I can answer both of your questions at the same time in terms of what should they have done and why what they did was wrong. So I'm going to give you an example and explain four reasons why it was not reasonable. So an example of what they should have done is what Your Honor wrote in the Hoonah Indian Association case. This is the Kiksati Survival Trail case. In that case, you wrote that the Forest Service had spent three years consulting with the tribe, conferring with tribal elders, meeting with ethnographers and archaeologists trying to determine the location of this trail. They compiled a rather exhaustive record. Now the issue in that case wasn't consultation, it was the listing. But that gives you an idea of what they should have done and the answer is to go to the tribe first. Now how should they have ended up at the one Chumash tribe? There are more than 30 references to the word Chumash in this record. More than 30 beginning in 1997. And I can give you the very first time. I don't see why that's relevant because they did contact the Chumash entities and individuals that were named by SHPO and NAHC. It does not matter under the statute. Does it say in the regulation that it's not a reasonable and good-faith effort if you don't... I'm not even sure of how it would require that they do this step of identifying additional tribes or entities that might have an interest. So consultation only is satisfied under the law if you're contacting the federally recognized tribe. There is no consultation... Does it say that in the statute? Agencies shall make a good reasonable and good-faith effort to identify any Indian tribes. And then it designates specifically not only in the statute, it says 800.2C, consultation shall be conducted in a sensitive manner respectful of tribal sovereignty. And then the DOD policy instruction, which is on I think 26 or 27 of our brief, says to the Corps, the district engineer shall initiate consultation with the tribal government. Now that's the key point here, is that they had to contact the tribal government. That's also in the regulations. I take it by your answer that the deficiency is failing to contact the tribe itself, but as Judge Gutta pointed out, it is a reasonable and good-faith effort. And so what the agency, what the government is saying is they made a reasonable and good-faith effort to figure out which tribes to contact by the tribes that will be affected. Can you explain again to me why that's not a reasonable and good-faith effort? Why it has to be... You didn't find the right tribe, so therefore that's not good enough. It wasn't even an effort because they didn't contact the tribe at all. If all they had to do was to look at the 30 references for Chumash and look for a Chumash tribe, and they would have been there. And that is what CFR says to find, quote, any tribe. And it's not even one, or the one that's most closely related. CFR 800.2C1i. Second part, that might have an interest. They don't have to prove up front that this was our territory. The test is might. It's sort of interesting to me that neither SHPO nor NAHC informed the Corps that they had to contact the federally identified tribes. So is this a new interpretation then of this regulation and statute? No, and it may be informed by a couple of things. One is that when they made the request to the NAHC, the document found at volume 3, page 193, asks for contacts, quote, within Los Angeles County. And so they're automatically limiting the geographic scope of what they were asking for. But I would point out that the people that they gave them, all three of the five, it said Chumash by their name. And all they had to do was to take the one extra step of finding a tribe within 30 seconds. And that's one of the reasons why we think it's unreasonable. And so one good example to look at when you have numerous tribes or you're not sure who it goes to is the Tenth Circuit case of Pueblo of Sandia. There, they unearthed Pueblo remains and they thought, well, we don't know which Pueblo these belong to. So they sent letters to all of them because they, quote, might have an interest. They had meetings with the All-Indian Pueblo Council. Even that didn't satisfy consultation in the Tenth Circuit. But SHPO then withdrew its concurrence and told them to discuss it with a different entity. That didn't occur in this case, correct? Correct. However, it might be partly the reason might be under 800.4, let me find the statute. I can potentially give it to you on rebuttal. Part E says that they're supposed to notify the SHPO of any comments and they didn't give them any of the scoping letters or comments that mentioned Chumash. So you're down to two and a half minutes of your time. Did you want to say F for May I, Your Honor? Of course. Thank you. Can you adjust the temperature in this room? It's much too warm. Thank you. Good morning, Your Honor. It's John Busse for the balance of the appellants. I wanted to deal with the core permitting issues. First, the Newhall Ranch specific plan, which is the framework for this very large new town development, was initially approved in 2003. And that's before the applicant sought this particular permit. The specific plan, which provides that framework, was designed to fill waters of the United States and to fill wetlands, not to avoid them. And that's what creates this conflict between the core's subsequent obligations under the 404B1 guidelines, which govern the core's analysis here. And those guidelines strongly prioritize the avoidance of those waters and wetlands. There is a strong presumption that if there is a less damaging alternative that doesn't involve the destruction of special aquatic sites, that that alternative is available. And that the applicant bears the burden of demonstrating clearly otherwise, that such an alternative would be available. So the core argues that it looked at 23 alternatives or some large number of alternatives and taking into account the practicabilities, it made the determination that this alternative, which was not the preferred alternative of the permit seeker, was the practicable one. So why don't we defer to the core's determination after it went through this exhaustive review? The argument is not with the range of alternatives that were considered, but with the application of this practicability criteria, and particularly the cost practicability criteria. The core can consider, of course, whether an alternative... The core has to ultimately determine the least environmentally damaging practicable alternative. It can consider practicability in terms of costs and other factors in light of the applicant's overall objectives for the project. But that's where it fell down, and particularly on the cost practicability... I don't understand something about that. Your view on cost was that they should have to spend for it to be a fair reconciliation of cost with environmental desiderata, that they should have to spend a higher amount on mitigation, and also that they should be required to ignore sunk costs. Something you would not do in utility regulation, for example, but you're saying that a developer does have to ignore sunk costs when practical costs are evaluated. And I don't really see why that's required by the law. I can see how it can be argued. Economists are always saying, well, ignore sunk costs of making a decision about the next dollar, but I can't see why a developer should have to do that. And if I could just add on to that question, I didn't understand why the land was a sunk cost, given that they could recover the value of the land, presumably by selling it. So if you could answer both of those. Let me deal with the two parts of the question. The first part, I don't really agree that that's our premise. Our premise is not that the developer... We must stick it to the developer to incur more costs to avoid. Our point is that the approach that the Corps took, which is supposed to arrive at avoidability at the least damaging practicable alternative, was not geared to do so because the approach it took assumed things that disincentivized avoidance. But on the second point, we're not saying, well, the Corps didn't have discretion to consider a certain cost. We're talking particularly about this land acquisition cost of $386 million, 30% of the total fixed cost, which doesn't exist at all. Why doesn't it? I mean, the land has value, and so if they can't build, then they would sell the land. It's not a sunk cost in the sense that that term is used in economics, that you can't recover those costs. A recoverable cost is fine, but the fixed costs that are considered in terms of determining the range of alternatives that may be practicable was... It's not a fixed cost. That's an asset. They're considering the... We think that's what they're doing. There's no evidence in the record where that $386 million came from. They simply assume that that's the land value. That's not a fixed cost of development. That's an asset. Can you develop without land? Isn't that a cost of the development, is to have land to develop on? There was no such cost actually incurred, Your Honor. That is not... They were born with that land. They weren't a sunk cost at all. In fact, I think that's accurate. If it's not a sunk cost at all, I don't understand why the argument should proceed from the premise that you ignore the sunk cost, let alone even if it was a sunk cost. I think, Your Honor, it is correct that in our opening brief, we referred to it as a sunk cost. A sunk cost is something that is a recoverable cost. This is a cost that didn't exist. It was not a cost at all. Then why shouldn't it be considered in deciding what's practical? Well, we tend to think that it's... If the developer proposes to spend $386 million on land plus vast additional amounts, if they're allowed to go forward with the development, and of course not if they're not, why doesn't a consideration of practicable, the legal term we have to use, include that? Because the developer didn't propose to spend $386 million. The developer owned that property for over 100 years. They owned it at the time of the application, and they owned it when the permit was issued. Where is that cost? Why even assume that cost when it doesn't exist? That's our point. It's not that the court can never consider this type of cost. I wouldn't make that argument. I don't think that's correct. Well, if you're deciding to develop something that you've owned for 100 years, you compare what it would cost to develop it and what your return would be against what you'd get from just selling it or keeping it for another 100 years. That's... I think we'd agree with that point, and that's why there's proper fixed costs that can be considered the costs associated with infrastructure for the projects. Those should be considered for all the alternatives. But this cost is not a real cost. So if I understand you right, the court could consider the cost of the land if the developer purchased the land in order to go forward with the project, but the court cannot consider the cost of the land if the developer already owned the land. Is that the position you're taking? With some reservations. The point of these guidelines in the consideration of cost is to incentivize avoidance. If consideration of those costs is something that can not disincentivize avoidance, then I think it's proper. This case, not only does it disincentivize avoidance, it's fictitious. It has no existence in reality. It should not have been considered a fixed cost, and it's highly distorting to the court's entire analysis. I just don't get it. Suppose my kids inherit one of my cameras, and they're deciding, shall we take pictures with it or shall we sell it? Well, the practical cost of keeping it and taking pictures with it is what they'd get for it if they sold it. Which is different than... What if they incurred costs to repair and upgrade and restore that camera along the way? That's a proper fixed cost. So I could get X dollars for selling it. If I keep it to take pictures, I've gotta put Y dollars into cleaning, lubrication, and adjustment. So what you do is you consider what you'd get if you sold it as is, what it would cost to develop it to the point where it's more usable. What am I missing here? I just can't see why the cost of the land should be disregarded. Well, I think if I'm undertaking an enterprise, I wanna set up my fixed cost of doing that business. I'm not gonna acquire any... You look at opportunity cost. If your labor's free, you still look at opportunity cost. If you inherit the land, you still look at opportunity cost. But to consider something that was not a cost that was actually incurred, I think is our point. This is unlike the infrastructure cost, which will necessarily be incurred. So the developer says in developing this, this is not a cost that will be incurred. It's not an accounting principle to consider that as a fixed cost. That's an asset. That's unlike the infrastructure, the fixed infrastructure costs that are properly considered. But this was counted as 30% of that total, which again, totally distorted the range of what the Corps viewed as economically practicable. And we don't know, Your Honor, in those other projects that this project was compared to, to determine whether costs are practicable, was the same approach taken there. What were the land acquisition costs for those projects? Are we assuming a similar 386 million or a similar basis for those costs? This is the true apples to oranges comparison in the Corps' analysis. You are saying, ignore the value of the land. I think ignoring the value of the land is the only apples to apples comparison that can be made in that, in that comparison to those, that other range of projects. You're going into your co-counsel's rebuttal time. Yes. Sorry, Your Honor. And I did, I did still had issues to deal with if I can deal with them briefly on rebuttal. I'll do so otherwise. Thank you. You have no rebuttal time. Okay. Thank you. May it please the Court, Anna Katselis for the Corps. With me at council table is Jim Rusk, who will speak for four minutes on behalf of Intervenor Appley, Newhall Land and Farming Company. May I please watch the clock? I will, Your Honor. Thank you. Let me jump to the Historic Preservation Act claim. There are two distinct issues before the Court that the band is conflating. The first one is whether waiver applies to the claim. And then the second one, if the Court decides that waiver does not apply, is the merits of whether the Corps complied and met its requisite, reasonable and good faith obligation. Waiver absolutely applies here. There is no exception to the waiver requirement for Historic Preservation Act claims. So where in the statute does it require exhaustion? Because APA 704, Section 704 says exhaustion's required only if it's required by statute or rule. So where is exhaustion required? We're not making an exhaustion argument, we're making a waiver argument. Okay, so is there any case that looks at NHPA? Because the cases you cited were NEPA cases. Well, I mean, waiver applies generally to APA, to bringing a lawsuit under the APA. There is no exception for Historic Preservation Act. Where does it say that? I mean, there's the 704, which says exhaustion's required only if it's required by statute or rule. And then you've cited public citizen in Vermont, Yankee, which are NEPA cases which involve public notice and comment. That's how the statute is set forth and the procedure is set forth. And I didn't see that procedure in NHPA. But it's not specified by statute in many instances where it's applicable. And it applies here just as it applies... I mean, this is also, Your Honor, this is a project that was... There were multiple opportunities. Right, but those were other statutes. So if we have an NHPA claim, there's no proceeding that the agency has where they give public notice of the NHPA issues and request public comment. Well, there's a cultural resources section of the EIS, Your Honor, that goes out for comment. I'm talking about NHPA, not the EIS. That's NEPA. So I understand under NEPA, we've held, and the Supreme Court has held, that if you haven't made your claim before the agency, then you can't make it before the court. But I don't see that in the NHPA context. That's a separate, standalone statute. I'll respectfully just agree. I won't spend too much time, more time on that. But we submit there is an important distinction between exhaustion and waiver. This is not exhaustion, this is waiver, and it doesn't apply... Where's the case that says waiver applies to the NHPA? I don't have that at my fingertips, Your Honor. Okay, thanks. I thought you couldn't get the waiver under the National Historic Preservation Act unless the party claimed to have waived its rights had fair notice. And without notice to the tribe, I don't see how they could intentionally relinquish a known right. It wouldn't be known. Well, one, there's no argument, the tribe has made no argument that it didn't have notice of this project. I think that's a notable omission from the record. They've never made any argument that they weren't aware of it. They've simply taken the position that they didn't have to voice their objection during the administrative process. Well, the statute does put the burden on the agency to consult. It's not their obligation to come and give public comment. That's in the NHPA context. You are correct, Your Honor, and I'll move on to the merits point of that argument. On the merits, this is the closest federally recognized tribe to the project area, correct? This is a Chumash tribe within the area, that's correct, Your Honor. But let me start with what the regulations require, which is that it consult with any Indian tribe that attaches religious and religious... But you wouldn't know that unless you contact the appropriate tribes. Should we look at the fact that it was fairly easy to discern which tribe is closest to the project area in determining whether the court acted reasonably and in good faith in reaching out to the tribes? This is... I would urge the court to look at the record. The court reached out to, as you mentioned, both the NAHC and the NAHC, provided to the core, and the core contacted them. None of those entities suggested or recommended that the Santa Ynez band had any connection to this property or might attach significance to any historic property in the area. And beyond that... That's really not my question, though. Clearly, efforts were made in order to contact the appropriate stakeholders and to try to find the right tribes. But it's not hard to do a simple Google search that this is... The band is the closest federally recognized tribe to the project area, and there aren't that many there. So my question is, does the fact that it's so easy to find the tribe that might potentially be affected by the project affect the analysis as to whether the core's efforts were reasonable and in good faith? I think on this record, no, Your Honor. And I think because there's a premise here that is not supported by the record that the band is pressing, which is that Chumash are all the same. The record demonstrates otherwise. And that's the point I was trying to make, that the NAHC, which is the trustee agency under California law, identified Chumash people that the core did contact. And it's expert judgment to contact these people. And there's also evidence in the record that the Santa Ynez band is linguistically distinct from the Chumash in Ventura County. So I think you have to look at that evidence, which we've detailed in the brief and is in the record. You can look at our supplemental excerpts 89 in that area. But it is not the case, and it's not a correct assumption, that all Chumash are... As a statutory interpretation matter, when the NHPA requires the agency to contact Indian tribes, does that mean federally recognized tribes or does it require the statute to also say tribes that are federally recognized? Is there a definitional section that would clarify that to us? I don't have that in front of me, Your Honor, but there is clearly an obligation to consult with any federally... Any recognized tribe that attaches religious and cultural significance. But here, there's a disconnect. The Santa Ynez band is federally recognized, yes, but there is no indication in the record that it attaches religious or cultural significance to any historic property in the area. And that is supported, again, by the multiple outreach efforts to the NHC, to SHPO, to all the entities and the individuals that the NHC suggested and recommended to the Corps. No one suggested that this band might attach significance or that this band should even be contacted for that possibility. And then beyond that, there is also the evidence in the record that Chumash is not all exactly the same and that there are important linguistic differences. There's the ethnographic study that we discussed in our brief. That further supports the Corps' conclusion. And again, here, as Judge Ikuda, you mentioned before, the standard is whether a reasonable and good faith effort was made. The answer is yes. And one more point on this. The band has made bad faith allegations. None of that is supported by the record. There was a very diligent effort here. And the Corps is entitled to a presumption of regularity. Let's say that... Let's assume for purposes of discussion that you lose on waiver. You're still saying consultation was adequate, although you did not consult basically because you couldn't find them. Is that right? That's correct, Your Honor. We have made the merits arguments that the Corps complied with the Historic Preservation Act. And again, there is... The requirement is to make that reasonable and good faith effort and to consult with any tribe that attaches religious or cultural significance to this area. As I understand it, this is actually not a tribe, it's a band, the Santa Ynez Band. It's both. It's a Santa Ynez Band and it's a federally recognized tribe. The band is a recognized tribe? Correct. They are a recognized tribe, Your Honor. But again, the fact that they are recognized is only part of... It's only part of the issue. The second... The critical point here is whether they attach significance to any historic property. And again, it's not enough just to have an interest in the site or the area. It's historic... The goal of the Historic Preservation Act is to identify and protect historic properties. And that's also explained in our brief. The Corps did that. The Corps' consultants identified eight historic sites. Through that... Through all of these outreach efforts to things like Indian grave sites... Correct, Your Honor. Cave writings, wall writings, that sort of thing. That sort of thing, Your Honor. That's correct. And the Corps' consultants identified eight sites. Throughout all of this outreach, no one identified any site that the Corps had overlooked. The Corps entered into a programmatic Section 106 agreement to address those sites. That agreement also provides for further efforts if any additional sites are discovered in the future. But the Corps met its obligation. The SHPO concurred that the Corps made the requisite outreach efforts and also that the Section 106 agreement evidences compliance with the statute. The Corps fulfilled its obligations under the Historic Preservation Act. I'll turn also... I'll turn to the cost issue. And it's absolutely correct. It's... The idea that it's a sunk cost is incorrect and unsupported by the record. And briefly, I'll raise again, this was also waived. This was not raised during the administrative process, and waiver applies here. There was an opportunity to raise it during the administrative process if they had an issue with the cost analysis. CBD never raised it. And for that reason, the record is not as developed as it otherwise might have been on that issue. But New Hall's... The cost... The value of the land is in the record. It's in a report. It's New Hall's SCR 193 that assigns this value to the land, and it's comparable to the cost for the other sites that were surveyed. And that... What that does, I mean, it's eminently reasonable and practical that you would consider the site. And there's no reason that it would have been excluded, and there's no indication in the record that it was arbitrary or skewed. And again, there are allegations by CBD that the Corps skewed the analysis. They used the word manipulated. But again, there's no evidence in the record of that, and the Corps is entitled to a presumption of regularity in its analysis. So, I think, overall, Your Honor, on the Clean Water Act issue, there is a very rigorous analysis. And the outcome is also... Belies the idea that the Corps skewed this or manipulated its analysis to adopt New Hall's proposal. And bear in mind that the permit the Corps issued protects... It requires avoidance and protection in perpetuity, 92% of the jurisdictional waters on the site, 98% of the wetlands on an approximately 13,000 acre project site. Of 660 total acres, the Corps' permit authorizes permit impacts to only 47.9. It reduced the impacts by nearly 50% and by nearly 75% for wetlands compared to the project that New Hall proposed that had gone through the county's process for years and years. So, you're saying that this is alternative three that the Corps... Modified, and then after the FEIS process, working with EPA and in response to comments from the Regional Water Control Board, as well as Ventura Coast Keeper, required additional mitigation and additional efforts. So, in all of these, there's... The common thread through CBD's Clean Water Act challenges is this argument that the Corps manipulated the analysis by skewing the overall purpose, by including the cost of the land, and there's simply no evidence in the record to support any of that. Does the Court have questions about any of the other issues? Apparently not. No? Okay. I'll give the rest of my time to New Hall. Thank you very much. Thank you. May it please the Court. I'm Jim Rusk for New Hall Land. If I could, I'd like to make a few quick points of clarification about the NHBA issue. First, to answer a question, the Santa Ynez Band is the closest federally recognized tribe to the project site. It happens to be the only federally recognized Chumash tribe, but for instance, the Tejon tribe is closer. A variety of other tribes are closer. If you look on the BIA's website, they have a figure that shows a location of various tribes. So, which leads to another point. The Santa Ynez Band really hasn't even attempted to show that it, in particular, has a connection to the site. It has said that the Chumash peoples generally do, but as Ms. Katsilas noted, there are various Chumash peoples. The site is more linked to the extent it has Chumash connections with other non-coastal Chumash bands, and the Santa Ynez Band does not speak for them. As to the process here, this would agree completely with the notion that the Court made a reasonable and good-faith effort by consulting the expert agencies charged with identifying potential consulting parties. This was not a one-off process or something they came up with. This is the normal process that the Court and other federal agencies use when they're conducting this kind of consultation. Could you address Judge Nguyen's question? If the developer and the Corps could have found the Santa Ynez Band on the federal list by googling Santa Ynez Band, why shouldn't they have been required to consult with the Santa Ynez Band about whether it had any sites of historical and cultural significance in the project area? Well, that goes to the process point, Your Honor. The Corps doesn't conduct consultation by randomly googling... That's not random. What you do is you bring up Google, you type Santa Ynez Band, and you get a list. I guess the simple answer, Your Honor, is the words Santa Ynez Band never appear in the record, not once in 130,000 pages. So for the Corps to come up with the idea that it should Google the name of a tribe located 120 miles away in Santa Barbara... I think the argument that they're making is that the BIA maintains a list of federally recognized tribes, and once you knew that Chumash artifacts or that there was Chumash interest in the property, you could have easily determined by looking at the BIA list that the federally recognized tribe of Chumash was the Santa Ynez Band. I guess, but again, the simple fact that they're federally recognized does not mean that they, as opposed to other local Chumash groups, might have a connection to the site, and the Corps did consult with local Chumash. Did you have an answer to my statutory interpretation question, whether the words Indian tribe in the NHPA refers to federally recognized tribes or other informal tribes and organizations? I believe the term Indian tribes is defined as federally recognized. And as Ms. Katselos noted, being a federally recognized tribe is not a sufficient condition for being entitled to consultation. You must also attach significance to the site, and here there was no evidence in the record that it is. Well, that's what you consult them for, to find out if they do. So you've got a list of federally recognized tribes that includes the Santa Ynez Band. Could you and must you just hire some kid who will work for minimum wage to type in the name of each one and find out if it's anywhere near the project site? Well, Your Honor, the Corps, obviously, is not an expert in archaeological research. That's exactly why they consult the Native American Heritage Commission and the State Historic Preservation Officer. And this is... What you're supposed to do is you find the tribe, and then you consult with them. Do you have any burial sites there, that sort of thing? Yes, Your Honor, but you would, again, you would consult with tribes that you reasonably believed might attach significance to the site, and the normal practice is to do that, to identify those potential consulting parties by asking the Commission and the Historic Preservation Officer. So your state experts said these are the people you should contact, and you contacted all the people that the state experts said to contact, and none of those people referred you to the Santa Ynez Band? Correct. And so is there any case that indicates that more was required? They cite the Tenth Circuit case and the like. Right, which was not a consultation case. The threshold issue of consultation wasn't at issue there. I don't believe there is a case that directly addresses that issue. Is it true that the record contains nothing showing that the Santa Ynez Band has anything of cultural or historical significance within the project site? Correct, Your Honor. To my knowledge, absolutely nothing in the record connects the band to the site. So even if you missed them, there would be nothing to talk about, as far as the record shows? Correct. Nothing in the record shows that they had anything more to add to the consultation. Isn't there argument that there's nothing in the record because you didn't consult with them? So they didn't have an opportunity to inform the record with their information about their interest? Yes, Your Honor. But nonetheless, the Corps' action has to be judged on the record, the information actually before it at the time, not on a record made in litigation. And here, the band still hasn't offered any explanation as to why, if it attached such significance to the site, it never, in eight years of the Corps' process, raised its hand and said, Hi, we're the Santa Ynez Band. We have something to say here. Understanding it's the Corps' obligation, but it goes to the reasonableness of the Corps' belief that it had appropriately identified consulting parties. Okay. Your time has expired. Are there any further questions? Thank you. Thank you. I think there's rebuttal for the... Thank you, Your Honor. I'm going to try and answer some of the questions. The statutory site for that it's the federally recognized tribe is the only one to whom the benefit in NORS is 54 U.S.C. 300309. It's a term of art used throughout Title 25 Indian law. Everybody knows what recognized means. It's specified in the statute. They're only also the only ones to benefit from the term shall consult in that statute. So what I want to make clear is when they say they made a reasonable effort, they talked to some individual Indians. And the court in the Southern District of California did a great job in explaining this in the Quechuan case and said, They're not interchangeable for purposes of consultation. You don't find an Indian and sign a contract with them and they agree to all of your procedures and processes and help you with your burials. It's defined in the statute. It has specific legal meaning. It's used in the regulations. It is not an unknown. Was the Santa Ynez Band aware of this Newhall project? There is zero evidence in the record that they had any knowledge. And we put this in our brief. It's on page eight, either of our opener or our reply. Zero evidence. They joined the case in the second amended complaint. Reasonable inference they find out from the complaint. But really, there is zero record evidence. Did they at any point move to supplement the record with any evidence that they had anything of cultural or historical interest that they wanted to consult about? Their chairman added a declaration in the beginning of the litigation to point out that, Yes, we do have interest in this area. We would have told you if you would have consulted us. Did he say what the interest was? Burials. It's burials because they used to bury their dead by the rivers. And of course, if you know, within the exterior perimeter of this case, of the project area, I should say, although technically not owned by the defendants, Newhall, owned by an easement in the state of California, were almost 50 human remains. And it's worth pointing out this is related. So the tribe's position is they're going to find more as they build. So the interesting part is that they keep trying to preserve their argument by saying it's the Santa Ynez band that had to have some identification. These sites are Roman Empire era. I mean, this is 2000 years old. There was no list at the time with a separate band. So when Pueblo of Sandia, when they find Pueblo remains, they don't say it's Santo Domingo. We better not talk to anybody else. They go to all the Pueblos because these are very ancient sites. And with that, Your Honor, I'm sorry I've run out of time. Thank you. We appreciate your arguments. The case of Center for Biological Diversity versus Newhall is submitted.
judges: Kleinfeld, Ikuta, Nguyen